FILED

2016 Aug-16  AM 10:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **APRIL HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.  2:14-CV-0805-SLB** |
| | ) | |
| **RELS REPORTING SERVICES, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on Motion for Summary Judgment filed by defendant RELS Reporting Services [RELS].  (Doc. 57.)[1]  Plaintiff April Harris has sued RELS, alleging that it included inaccurate information from Experian on her credit statement provided to Wells Fargo.  Upon consideration of the record, the defendant's submission and argument,[2] and the relevant law, the court is of the opinion that RELS Reporting's Motion for Summary Judgment, (doc. 57), is due to be granted.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.  Citations to page numbers, except citations to the pages of Ms. Harris's deposition, refer to the page numbers assigned by the court's CM/ECF electronic filing system; citations to page numbers from Ms. Harris's deposition testimony, filed as doc. 58-1, refer to the pages of the original deposition transcript.

[2]Ms. Harris, who is proceeding pro se, did not file any opposition to RELS Reporting's Motion for Summary Judgment.

# I. <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial"). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the

motion [and] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." *Id*. (e)(2)-(3).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380.

## II. <u>STATEMENT OF FACTS</u>

The following facts are supported by record evidence and are deemed undisputed, Fed. R. Civ. P. 56(e)(2):

### I. Plaintiff's Asserted Basis For This Lawsuit.

1. Plaintiff's full name is April A. Harris. [(Doc. 58-1 at 86.)]

2. From approximately November 2011 through June 2012, Plaintiff lived at a Levittown, Pennsylvania address, which is in Bucks County[,] Pennsylvania. [(*Id*. at 65-67, 76.)]

3. In May 2012, Plaintiff submitted an online application for a mortgage loan with Wells Fargo. [(*Id*. at 142, 144.)]

4.   Plaintiff does not know the amount of the loan or interest rate that she applied for in her online application.  [(*Id*. at 147.)]

5.   The Uniform Residential Loan Application associated with her application for a mortgage with Wells Fargo states that the mortgage applied for was for $162,011.00 and the interest rate applied for was 3.75%. (Wells Fargo Uniform Residential Loan Application ("Loan Application"), attached hereto as Exhibit B.)][3]

6.   Wells Fargo requested Plaintiff's credit information as part of the mortgage application and RELS subsequently provided the tri-merge credit statement[4] to Wells Fargo on May 16, 2012.  [(Doc. 61-2 ¶¶ 9-10.)]

7.   Included in the tri-merge credit statement, was one "derogatory item":  Experian reported a "Comcast Bucks Cty Service" account in collections by Eastern Account System (the "Eastern Collections Account"). [Doc. 61-2 at 11.)]

8.   The tri-merge credit statement included separate credit scores calculated and reported by each of the three NCRAs[, national consumer reporting agencies:  Equifax, Experian, and Trans Union]. [(*See id*. at 10.)]

9.   As part of the mortgage application, Wells Fargo represented to Plaintiff that it would use the "middle" credit score, which was reported by Equifax.  [(Doc. 58-1 at 107, 114.)]

10.   The Eastern Collections Account, which was not reported by Equifax, did not factor in to Plaintiff's Equifax credit score.  [(Doc. 61-2 at 10-11.)]

11.   Plaintiff does not recall any communications from Wells Fargo stating that the Eastern Collections Account had any bearing on its decision to extend her credit.  [(Doc. 58-1 at 104-05.)]

---

[3]Ms. Harris testified that she did not remember requesting a loan for a specific amount or a specific interest rate.  (Doc. 58-1 at 147.)

[4]A tri-merge credit statement is a single credit report containing the consumer's information from the three national CRAs – Equifax, Experian, and Trans Union.  (*See* doc. 61-2 ¶¶ 1-2.)

4

12.  Wells Fargo approved Plaintiff for the loan amount and interest rate that was listed in the Loan Application.  [(*Id*. at 155-56, 161, doc. 58-4 at 2; doc. 61-1 at 2.)]

13.  Plaintiff did not complete the application process.  [(Doc. 58-1 at 158-59.)]

14.  Wells Fargo never denied Plaintiff credit; Plaintiff simply failed to complete the application process.  [(*Id*.; *see* doc. 58-4 at 3 [setting forth additional documents needs to complete loan process].)]

15.  Plaintiff claims that she suffered from emotional distress as a result of RELS's conduct.  [(Doc. 1 ¶ 71.)]

16.  Yet, Plaintiff admits that she has not sought medical treatment to diagnose or treat any symptoms of emotional distress as a result of RELS'[s] conduct.  [(*See* doc. 58-5 at 8-9.)]

## II.    The Relevant Collections Account.

17.  Plaintiff alleges that RELS reported the Eastern Collections Account, which did not belong to her.  [(Doc. 58-1 at 64.)]

18.  Plaintiff never disputed any of the information contained in the [tri-merge credit statement] with RELS.  [(*Id*. at 116-17.)]

19.  Plaintiff disputed the account directly with Experian in or around November 2013, which was approximately 18 months after she allegedly learned that Experian had reported the account.  [(*Id*. at 101-02, 118-19.)]

20.  On or around December 4, 2013, Experian sent Plaintiff a letter stating the results of the reinvestigation wherein Experian deleted the Eastern Collections Account.  [(*Id*. at 119-20; doc. 58-6 at 2.)]

## III.    RELS's Limited Role As A "Reseller" Under The FCRA.

21.  RELS is a "reseller" as defined by the FCRA.  [(Doc. 1 ¶ 20; doc. doc. 20 ¶ 20.)]

22.   RELS assembles and merges information obtained from the NCRAs, but does not maintain a database of the information that it assembles and merges into a new consumer report.  [(Doc. 61-2 ¶ 3.)]

23.   RELS' process works as follows. A lender or prospective lender submits to RELS information relating to a consumer applicant.  [(*Id*. ¶ 4.)]

24.   RELS sends that information, without modification, to the NCRAs.  (*Id*.)

25.   The NCRAs' systems then receive these identifiers and evaluate the information they have assembled from their "furnisher" sources to determine which of that information relates to the subject consumer based on the information submitted.  (*Id*.)

26.   The NCRAs then provide that information to RELS.  (*Id*.)

27.   The NCRAs alone determine whether a particular account (e.g., credit card or mortgage) relates to a specific consumer.  [(*Id*. ¶ 5.)]

28.   RELS does not have any role or input when the NCRAs evaluate the information they receive from various sources and match it to a particular consumer, nor does RELS have any access to or understanding of each NCRAs' proprietary algorithms and "matching" logic.  (*Id*.)

29.   RELS then uses a proprietary technical process to accurately assemble and merge the information provided by its established sources – the three NCRAs – into a tri-merge credit statement, which RELS transmits to lenders or prospective lenders.  [(*Id*. ¶ 6.)]

30.   RELS displays all available information from the NCRAs in its tri-merge credit statements **without alteration** to enable the lender to review the information and determine if further inquiry with the NCRA or credit furnisher is required before making a decision on the loan application.  (*Id*.)

31.   The tri-merge credit statement merges and displays the information received from the NCRAs using rules required by the lender, consistent with the underwriting standards of organizations such as Fannie Mae and the Federal Housing Authority.  (*Id*.)

6

32.  True to its defined role, RELS displays on the first page of the tri-merge credit statements the information originally submitted about the subject consumer and conveyed to the NCRAs.  (*Id*.)

33.  It would not be practical for RELS to resolve variations in the over 1.2 million reports resold each year as less than .09% are disputed, only some of which involve a consumer claiming that an account is not his or hers.  [(*Id*. ¶ 5.)]

## IV.  RELS's Process For Generating The May 16, 2012 Tri-Merge Credit Statement

34.  On or about May 16, 2012, Wells Fargo requested information from RELS regarding Plaintiff in connection with her application for a mortgage loan, which included a full Social Security number, the name "April A. Harris," and an address.  [(*Id*. ¶ 9.)]

35.  To accomplish that return of information: (1) RELS transmitted all of the information received from Wells Fargo to the NCRAs; (2) the NCRAs used that information and their proprietary algorithms to provide information the NCRAs determined was related to Plaintiff; and (3) RELS then accurately assembled the information provided by the NCRAs into the tri-merge credit statement without alteration.  (*Id*.)

36.  RELS employed numerous measures to assure that it accurately assembled and merged the data received from the NCRAs.  [(*Id*. ¶ 11.)]

37.  These measures included conducting data validation audits to assure there were no discrepancies between the data received from the NCRAs and the data included in the [tri-merge credit statement].  (*Id*.)

38.  Additionally, RELS's systems employ rules to make certain that the information being provided by each NCRA is consistent with the type of data typically furnished by the NCRAs about consumers.  (*Id*.)

39.  This process helps assure that the information is displayed consistent with the lender's requirements and expectations and is exactly as provided by the NCRAs.  (*Id*.)

40.   It also permits RELS to return an error code when an NCRA furnishes data that conflicts with the specifications provided by an NCRA or the lender.  (*Id.*)

41.   As to Plaintiff's tri-merge credit statement, these processes did not raise any issues with the information furnished by the NCRAs.  (*Id.*)

(Doc. 58 at 5-12 [footnotes added; emphasis in original].)

## III. <u>DISCUSSION</u>

RELS argues that it is entitled to summary judgment because, as a reseller of consumer information, its actions were reasonable and because Ms. Harris cannot prove she was injured by any inaccurate information.  Because the court finds that Ms. Harris has not shown a disputed issue of fact with regard to whether she was injured by the inaccurate information in the credit statement, RELS's Motion for Summary Judgment is due to be granted.  The court pretermits discussion of whether RELS's procedures were reasonable.

The Complaint alleges that defendant RELS Reporting Service is a "consumer reporting agency as defined by 15 U.S.C. § 1681a(f) and a reseller of credit information."  (Doc. 1 ¶ 20.)  A "consumer reporting agency" [CRA] is "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties."  15 U.S.C. § 1681a(f).  A "reseller" is a CRA who –

(1)  assembles and merges information contained in the database of another [CRA] or multiple [CRAs] concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and

8

(2) does not maintain a database of the assembled or merged information from which new consumer reports are produced.

15 U.S.C. § 1681a (u).  "Thus, it appears that a reseller is an entity that purchases and resells consumer reports but does not itself create any consumer information contained in the reports."  *Poore v. Sterling Testing Sys., Inc.*, 410 F. Supp. 2d 557, 569 (E.D. Ky. 2006).

In her Complaint, Ms. Harris alleges:

35.  . . . [I]n May of 2012, RELS requested and obtained consumer credit and personal information about the Plaintiff from Equifax and Experian.

36.  Equifax and Experian supplied RELS with a consumer report or credit score, or both, concerning Plaintiff.

37.  RELS assembled and merged the information from Equifax and Experian into a consumer report.

38.  RELS sold the report to Wells Fargo in connection with Plaintiff's application for credit.  Prior to RELS' sale of Plaintiff's consumer report to Wells Fargo, RELS did nothing to reconcile inconsistent information from Equifax and Experian.  The report supplied to Wells Fargo contained inaccurate information.

39.  RELS did nothing to investigate the conflicting information received from Equifax and Experian.

40.  RELS failed to assure the maximum accuracy of the consumer report concerning Plaintiff that it supplied to persons.

(*Id*. at ¶¶ 35-40 [emphasis added].)  She contends RELS's conduct caused her "harm to credit reputation; lost credit opportunities; reduction in her credit score; unfavorable credit terms; emotional distress, including humiliation and embarrassment."  (*Id*. ¶ 71.)  Based on these allegations, she claims RELS violated negligently and/or willfully violated 15 U.S.C. § 1681e(b) of the FCRA.

Generally –

> [T]he enactment of the FCRA in 1970, and its amendment in 1996, coincided with the development of a modern credit reporting system in the United States. This system consists of a number of [CRAs], three of which have emerged as the major national credit bureaus, and numerous smaller CRAs. CRAs compile consumer information (such as payment history) submitted voluntarily by creditors and other businesses ("furnishers"), and disseminate compilations of that information in "consumer to creditors, insurance companies, employers, and others with a legitimate business need for that information. These consumer report "users" analyze the information to assess risks, often through a credit score that represents the risk numerically. This flow of information enables credit grantors and others to make more expeditious and accurate decisions, to the benefit of consumers.

*Report to Congress under Sections 318 and 319 of the Fair and Accurate Credit Transactions ["Fact"] Act of 2003*, 2004 WL 2930802, *9 (Dec. 1, 2004). Section 1681e(b) of the FCRA states: "Whenever a CRA prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). "To establish a prima facie violation under § 1681e(b), plaintiff must establish: (1) inaccurate information was included in [her] report; (2) the inaccuracy was due to [defendant's] negligent or willful failure to follow reasonable procedures to assure maximum possible accuracy; (3) [plaintiff] suffered an injury; and (4) [her] injury was caused by the inclusion of the inaccurate entry. *Smith v. E-Backgroundchecks.com, Inc.*, 81 F. Supp. 3d 1342, 1356-57 (N.D. Ga. 2015) (quoting *Neal v. Equifax Info. Servs. LLC*, No. 103-CV-0761-WSD, 2005 WL 5249668 *4 (N.D. Ga. Mar. 4, 2005))(internal quotations and original alternations omitted); *see also Ray*

*v. Equifax Info. Servs., LLC*, 327 Fed. Appx. 819, 827 (11th Cir. 2009)[5] (citing *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156, 1161 (11th Cir. 1991)); *see Jackson v. Equifax Info. Servs., LLC.*, 167 Fed. Appx. 144, 146 (11th Cir. 2006).

In this case, Ms. Harris has not come forward with any evidence that her Wells Fargo credit application was denied because of inaccurate information in the credit statement from RELS or that it was even denied. On May 25, 2012, Wells Fargo sent Ms. Harris a letter informing her that she had been approved for the amount set forth on her loan application. (Doc. 58-4 at 2; doc. 61-1 at 2.) Also, Ms. Harris testified that she was told by Wells Fargo that it "used the middle score in the RELS tri-merge statement or consumer report," (doc. 58-1 at 107), and the Equifax score was the middle score on her report, (*id.* at 108-09). The Experian consumer report was the only report received by RELS that contained the inaccuracy about which Ms. Harris complains.

Based on this evidence, the court finds that RELS has shown that Ms. Harris was not injured by the inaccuracy on her credit statement prepared by RELS. Ms. Harris, who did not respond to RELS's Motion for Summary Judgment, has not rebutted this showing with evidence. Therefore, the Motion for Summary Judgment will be granted.

---

[5]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it. ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***." 11th Cir. R. 36-2 (emphasis added).

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment, (doc. 57), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 16th day of August, 2016.

*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE